MAX B. SHUBIN AND SARA C. SHUBIN, ON BEHALF OF RELIABLE COAL COMPANY, A DISSOLVED CORPORATION, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 39773.    Promulgated March 4, 1932.

*Theodore B. Benson, Esq.,* for the petitioners.
*Hartford Allen, Esq.,* for the respondent.

OPINION.

TRAMMELL : The petitioners contend that the sale by the Reliable Coal Company of its property and business under the circumstances set out in our findings of fact was a sale on the installment plan

within the meaning of the Act. The respondent contends that it was a completed transaction and not a sale on the installment plan.

Section 212 (d) of the Revenue Act of 1926 provides as follows:

Under regulations prescribed by the Commissioner with the approval of the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the total profit realized or to be realized when the payment is completed, bears to the total contract price. In the case (1) of a casual sale or other casual disposition of personal property for a price exceeding $1,000, or (2) of a sale or other disposition of real property, if in either case the initial payments do not exceed one-fourth of the purchase price, the income may, under regulations prescribed by the Commissioner with the approval of the Secretary be returned on the basis and in the manner above prescribed in this subdivision. As used in this subdivision the term "initial payments" means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made.

In the instant case the Reliable Coal Company sold its property and business for $95,000. In payment therefor the corporation received back a purchase-money first mortgage for $50,000 on the ground, buildings and improvements. In addition it received $15,000 in cash representing money furnished by the purchaser, and $30,000 in cash representing the proceeds from a second mortgage placed on the property by the purchaser with a building and loan association and as collateral for the payment of which the corporation gave its bond for a like amount.

The petitioners contend that since the Reliable Coal Company was liable on its bond to the building and loan association for the payment of the $30,000 loaned to the purchaser and paid by him to the corporation the amount is to be considered as in the nature of a loan to the Coal Company by the building and loan association on the credit of the Coal Company and consequently was not part of the "initial payments" within the meaning of the Act. While a copy of the bond given by the Reliable Coal Company to the building and loan association was not put in evidence, the Coal Company apparently had no liability thereunder except in event the maker of the second mortgage or the purchaser of the property in this case failed to make payment. The transaction, therefore, was not unlike that where a seller receives in payment for property the promissory notes of the purchaser and thereafter endorses the notes and sells them. In the latter type of cases we have consistently held that the entire amount of the proceeds from the notes was to be included in determining taxable income. *Grace T. Mytinger*, 4 B. T. A 896; *Packard Cleveland Motor Co.*, 14 B. T. A. 118; *E. E. Chapman*, 19 B. T. A. 878. The expression "initial payments" is de-

fined in the above quoted section of the statute as payments in cash or property other than evidences of indebtedness of the purchaser. The $30,000 paid to the taxpayer in cash, derived from the second mortgage to the building and loan association was clearly something other than evidence of indebtedness of the purchaser. This mortgage was not received by the taxpayer, but by the building and loan association. The taxpayer received the cash. Accordingly we are of the opinion that the $30,000 received by it as the proceeds from the second mortgage given by the purchaser of the property to the building and loan association, is to be considered as part of the " initial payments " received during the year of sale.

Since the $30,000 is to be considered as part of the " initial payments," such payments received by the Coal Company during the taxable period amount to $45,000, or considerably in excess of one-fourth of the selling price of $95,000. The sale therefore was not one on the installment plan within the meaning of the Act. *Grace T. Mytinger, supra; Packard Cleveland Motor Co., supra; E. E. Chapman, supra.* The respondent's action in treating the sale as a completed transaction is therefore sustained.

The petitioners contend that the respondent erred in determining that the purchase-money first mortgage of $50,000 received back by the Coal Company had a fair market value equal to its face value and allege in the petition that the fair market value of the mortgage was not in excess of 80 per cent of its face value at the time of its receipt on May 4, 1927. In support of the contention the petitioners submitted evidence relating to the value of the property covered by the mortgage and to attempts made by Max B. Shubin to dispose of the mortgage and to obtain loans thereon. Shubin testified to a fair market value of the property in May, 1927, of $30,000. Another witness named Goodrich who was a real estate agent in Philadelphia from 1923 to 1927, testified to the same value. Goodrich also testified that in 1927 a short time before the property was sold he obtained an offer to purchase it at $30,000 but when he submitted the offer to Max B. Shubin the latter rejected it, stating that the property was worth $60,000, the price desired for it. The petitioners make no attempt to reconcile Shubin's testimony as to a value of only $30,000 with the statement as to value he made to Goodrich in rejecting an offer of that amount. If, as Shubin testified, the property was worth only $30,000, it is difficult to see why he rejected the offer to purchase it at that amount. His action speaks louder than his words.

In testifying as to his method of valuing property, Goodrich stated: " I don't go into obtaining the value of property so much by making an examination  *   *   * if I had a property offered to me I would usually submit it to one or two customers, and I would take it for granted that these people looking for properties knew their

own business and knew what it would be worth to them." The opinion testimony of a witness who arrives at values in this manner might or might not correctly reflect the fair market value of the property about which he testifies, but an opinion which has no sounder basis than this is not entitled to very great weight, especially where the owner refused to sell on the basis of value stated by the witness on the ground that the property was worth twice that amount.

Shubin stated that during 1927 or subsequently—just when is not shown—he attempted to sell the mortgage to every mortgage broker he knew at a discount of 20 per cent, but was unable to sell it. The record does not disclose whether his attempts were made in 1927 or subsequently. It very well may have been in 1930 before any such attempt was made, for all the record discloses. It is further open to the objection that the record is silent as to whether any of the mortgage brokers to whom the mortgage was offered were dealers in mortgages on the class of property covered by this mortgage. The record does not disclose to what extent the witness had acquaintance among brokers. He may not have known the brokers who were in the market for such securities. Shubin also testified to attempts made in 1927 and 1928 to borrow money and use the mortgage as collateral, and that the greatest amount offered to him was $20,000. The fact that $20,000 was the largest amount Shubin could have borrowed on the mortgage as collateral is not indicative of what the fair market value of the mortgage was. It may have been that the particular banks to which he applied for a loan did not make loans in larger amounts. The respondent has determined that the fair market value of the mortgage was equal to its face value of $50,000. From a consideration of the entire record we are unable to hold that the evidence is sufficient to overcome the prima facie correctness of that determination.

*Judgment will be entered for the respondent.*